UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
APR 25 2007
CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| CINDY IRWIN, | CIV 06-4034 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| THERMO BOND BUILDINGS, INC., | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendant filed a Motion for Summary Judgment, Doc. 29, in this action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), prohibiting employment discrimination based upon sex, 42 U.S.C. § 2000e-3(a), prohibiting an employer from retaliating against an employee for alleging sex discrimination and SDCL § 20-13 *et seq*. Plaintiff filed a response in opposition to the motion and Defendant has submitted a reply brief. The Court heard oral argument on the motion on April 23, 2007. The summary judgment motion will be granted for the reasons set forth below.

## BACKGROUND

The following are the facts viewed in the light most favorable to the Plaintiff, as the non-moving party. Plaintiff Cindy Irwin contends she was subjected to sexual harassment and a hostile work environment while she was employed by the Defendant, ThermoBond Buildings, Inc. in 2004. She also claims ThermoBond discriminated on the basis of sex by failing to give females equal opportunity for employment. Irwin claims she was fired in retaliation for making complaints of sexual harassment and discrimination. ThermoBond seeks summary judgment on all of Irwin's claims in this action.

ThermoBond manufactures prefabricated communication buildings. ThermoBond employs welders, carpenters, electricians, material handlers and others with specialized technical skills. Irwin was employed as an electrical material handler by ThermoBond from August 24, 2004 through November 24, 2004. Before receiving an offer of employment from ThermoBond, Irwin had been laid off from her previous employer. ThermoBond participated in a program supported by the State of South Dakota to train people for new employment who had been displaced by their former employer. This program reimbursed an employer for six weeks of an employee's salary if the employer employed that person for at least 90 days. ThermoBond's President, Mike Pottebaum, testified that he decided to participate in this program in an attempt to develop a new position as an electrical material handler, among others. (Pottebaum Depo. at 17, 19, 43.) Irwin was hired for the new position as an electrical material handler, although she had no previous work experience with electrical materials. Pottebaum's idea for this position was that Irwin could be trained to build electrical receptacles, take measurements, bend pipe and hook up electrical conduits, such that everything was in one piece and then an electrician could take the one piece and install it on the wall of the building being constructed. (*Id.* at 43.)

Irwin was informed before she accepted the position with ThermoBond that it was a temporary position for 90 days. Irwin testified she understood it was for a 90-day period and "[t]hat once I went through my training, if the training worked out, you know, if I caught on, possibility for a full-time position." (Irwin Depo. at 35.)

Irwin's assigned working area was in a shop that housed many of the supplies used to manufacture the buildings, including the supplies needed by electricians. Many of ThermoBond's employees were in the shop on a daily basis throughout the day to retrieve parts they needed in constructing the buildings. Irwin was the only female that worked in the shop on a daily basis. There were two other female employees, but they were assigned to work in the business office, which was in a different building. Jamie Hawkins worked in close proximity to Irwin in the shop and trained her, but he was not her supervisor. Irwin's direct supervisor was Mike Anglin.

2

One of the electricians that worked for ThermoBond was Tom Buchholz. He began his employment with ThermoBond a few weeks before Irwin. In a normal work day, Buchholz would enter the shop Irwin worked in two to four times to retrieve parts. Within one to two weeks of Irwin starting her employment with ThermoBond, Buchholz began asking her if she wanted to go out for a drink after work. He asked her this consistently for one week, but she declined his offers. When she declined, that was the end of the conversation each day.

The next incident with Buchholz that Irwin testified about, to which she took offense, occurred one day when it was hot and she wore shorts to work. She had a tattoo that was visible on her leg. Buchholz asked her how many tattoos she had. She replied that she had five. He then asked her where the other tattoos were and said, "Can I see them or do I just have to fantasize about them?" (Irwin Depo. at 122.) She told him she was not a slut or a tramp and then he disappeared between some buildings. She testified that this comment did not disturb her to the point that she didn't want to work at ThermoBond anymore. (Irwin Depo. at 127.) The same day Buchholz made the tattoo comment, Irwin told her supervisor, Mike Anglin, that Buchholz was "being a weirdo, saying weird things." (Irwin Depo. at 126.) Irwin also told Anglin that she wasn't going to wear shorts anymore. Anglin then said that he wore shorts and they say weird things about him. She then said to Anglin, "Well, this is kind of gross, but I'll try to handle it myself." (Irwin Depo. at 126.) Irwin did not expect Anglin to do anything about her interaction with Buchholz that day.

The day after the tattoo comment, Buchholz and Irwin were in the area where the time cards are kept. Buchholz was in the room when Irwin walked in and he said to her, "if I put my time card on top of your time card, that would be like us having sex without even touching." (Irwin Depo. at 130.) He then laughed and walked away. She did not report this incident to Anglin right away.

The day after the time card incident, Irwin wanted to feed some cats that were by the shop. She asked Hawkins if she could feed the cats and he said no. And then Buchholz said "No, we don't need any more pussy around here. We got enough." (Irwin Depo. at 140.) Irwin testified that this comment was made in front of Hawkins and that Hawkins told her to start writing down these

3

comments. (*Id.* at 140, 143.) Anglin was not at work when this comment was made, so Irwin did not report this incident right away.

The next incident occurred when Buchholz and Irwin were reporting for work and he said to one of the men that clean the buildings, "Hey, me and Cindy are just getting back from partying all night. We're just coming in for work." (Irwin Depo. at 143-44.) She responded, "Oh, gross, in your dreams." (*Id.* at 144.) Buchholz replied, "Yeah, you're in all my dreams, and you can imagine what we do." (*Id.*)

In the afternoon of the day he made the "dreams" comment, Buchholz said to Irwin, "I'm trying to wean myself off of sex. I don't want to go cold turkey. Can you help me?" (Irwin Depo. at 147.) Hawkins was not in the area when the foregoing comment was made. Shortly thereafter, Hawkins came within hearing distance of Buchholz and Irwin, and Buchholz commented that Irwin was getting good at doing the receptacles. Buchholz then said, "Ooh, I like my women fast." (*Id.*) Hawkins asked Buchholz to leave and he did.

On another day, Buchholz went to Irwin's work area and told her he couldn't wait until she came out to the plant that he was being assigned to because it was big and open with a lot of empty rooms where "we could really have fun." (Irwin Depo. at 154-55.) Irwin wrote this incident on the sheet of paper she had been writing the other comments on since Hawkins told her to write down Buchholz's comments.

After the comment about the empty rooms at the plant, Irwin reported the above incidents to Kim Ludwig, one of the women who worked in the business office. Ludwig told Irwin she would talk to Anglin about these comments when he returned to work. Approximately one week later, Anglin talked to Irwin and asked her why she hadn't told him Buchholz was making these comments. She said, "I was too embarrassed to tell a guy what another guy was saying like that. It was nasty." (Irwin Depo. at 161.) Anglin said he would talk to Pottebaum about it. At this point, Irwin was satisfied with the company's action relating to Buchholz. (*Id.* at 161-62.)

4

After Anglin spoke with Irwin, it was approximately one week later that Irwin again complained to Ludwig. There was a one-week period of time that Buchholz was not bothering Irwin, but then it started up again. She and Buchholz were getting parts and she had to re-look at the parts because it has been so long that she couldn't remember how to do something. And Buchholz then said, "Yeah, it's been so long that I can't remember how to do it either." (Irwin Depo. at 163.) Irwin understood this to be a sexual comment. (*Id.* at 164.) The same day Buchholz made this comment Irwin complained to Ludwig, who said she would inform Pottebaum. Within a day or two of this complaint, when Pottebaum returned to the office, Ludwig informed him that he should speak to Anglin about a situation with Irwin. Pottebaum spoke with Anglin, who told him that Irwin had said she was being harassed by another employee but that she could handle it. Anglin then informed Pottebaum that Irwin had complained again since the first time he spoke with her. Pottebaum was going to have Irwin come to the office after his conference with Anglin, but she happened to be in the office and he called her into his office.

At the time of Irwin's meeting with Pottebaum, ThermoBond did not have a written policy regarding sexual harassment or discrimination. Pottebaum, however, testified he informed Irwin during his meeting with her that ThermoBond had "a zero tolerance policy of any kind of harassment – sexual, physical, period – and that I didn't want her to handle it. We had to handle it. And if it were happening, we had to address that immediately." (Pottebaum Depo. at 21.) She told Pottebaum that there were no witnesses to Buchholz's statements and that he always made the offending comments when no one was around them. He asked her to write a list of the things Buchholz had said to her while he investigated her complaints.

After the meeting between Pottebaum and Irwin, Pottebaum investigated her complaints by speaking with several people that worked closely with both Buchholz and Irwin. The first person Pottebaum spoke with was Hawkins, who said he had not witnessed any harassment but that Irwin had told him Buchholz was harassing her. Pottebaum also spoke with Donald Burns, another employee that worked in close proximity to Irwin. Burns did not hear any statements that he felt could be construed as sexual harassment. Pottebaum also spoke with some of the electricians and

they had not heard any statements that they felt could be construed as sexual harassment. Chris Streets is one employee Pottebaum spoke with that believed Irwin because he "couldn't figure out why she would lie to me." (Pottebaum Depo. at 31.)

After Pottebaum conducted this investigation, Irwin came into his office and complained that Buchholz had thrown a banana peel on her car and he had been harassing her. She also testified that Buchholz urinated by his car during this incident. Pottebaum again investigated these allegations. He spoke with several people and learned that Irwin had not seen Buchholz throw the banana peel on her car and no one else had seen him do so. One individual who had personal conflicts with Buchholz, Bill Douglas, told Pottebaum that he was sure Buchholz was not the person that threw the banana peel on her car.

Pottebaum was "comfortable" that Buchholz was not sexually harassing Irwin, but in light of Irwin's allegations and other considerations Pottebaum decided to assign Buchholz to work in a different building that was approximately two miles away from the shop Irwin worked in. (Pottebaum Depo. at 37-38.) For both Buchholz and Irwin's benefit, Pottebaum asked that Buchholz's partner, Dan Sullivan, get the supplies from the shop as often as he could rather than having Buchholz go to the shop. At a couple of points in her deposition, Irwin testified that after Buchholz had been moved to the different building, he never made any additional "bad comments," or "perverted" comments. (Irwin Depo. at 170, 174.) But then she testified it was after the move to the new building that he made the comment about all the room at the new building and that they could have fun out there. (Irwin Depo. at 171.)

Irwin believed it was after Buchholz was moved to the new building that he said something about her being in trouble if she came out to the new building. (Irwin Depo. at 171.) He also called her a "bitch for telling on him." (*Id.* at 174.) In the last four to six weeks of her employment with ThermoBond, Buchholz did not make any additional comments she felt amounted to sexual harassment. (*Id.* at 207.)

Pottebaum testified that he informed Irwin to tell him immediately if anything happened that "you can even remotely construe as harassment, sexual or otherwise." (Pottebaum Depo. at 39.) Pottebaum saw Irwin three or four different times after he moved Buchholz to the new building and he asked her if there had been any further harassment, which she denied each time.

Irwin's employment with ThermoBond was terminated on November 24, 2004, which was 90 days after she began her employment. Pottebaum informed her that her job no longer existed and that her position "was just an experiment, and we need to let you go." (Irwin Depo. at 192.) She asked if there were any other jobs that she could do, but Pottebaum told her there were none available.

Regarding Irwin's termination, Pottebaum testified she did not have the mechanical aptitude to perform the tasks he and Anglin hoped she would be able to do in this new position. (Pottebaum Depo. at 42.) They had made the decision six weeks before her termination that she wasn't going to be able to perform the tasks they wanted her to do, but they decided to continue her employment for the entire 90-day period under the State program because the State would only pay one-half of her salary if she was employed for at least 90 days. (*Id.* at 41-45.) She was able to make receptacles that satisfied some of the electricians, which provided some benefit to the business, so Pottebaum decided to continue her employment for the entire 90-day period. (*Id.* at 41, 44-45.) No one has since been hired to do the job that Irwin had with ThermoBond.

Pottebaum wrote a positive letter of recommendation for Irwin. He said Irwin was a "good, hard-working and dependable employee." (Pottebaum Depo. at 49-50.) He testified that the following statement in the letter of recommendation was an overstatement: "We've hired her for a new position that simply didn't work out. She was fine, but the position wasn't." (*Id.* at 50.) Elaborating on his letter of recommendation, Pottebaum testified that Irwin "was not doing a good job in that position, but she was a good employee in that she showed up, was willing to learn, and so on." (*Id.* at 56.)

7

In the first count of her Complaint, Irwin alleges ThermoBond is liable for engaging in and tolerating or failing to prevent sexual harassment in the workplace, and in failing to give females equal opportunity for employment in non-administrative positions within its business. In the second count, Irwin alleges she was terminated in retaliation for her complaints of sexual harassment and discrimination and due to the fact that the co-employee who had harassed her would be returning to the same building in which she was working. The third count alleges unlawful discrimination in violation of SDCL § 20-13 *et seq.* Among other relief, she seeks compensatory damages for mental anguish, emotional distress, medical bills and back pay, punitive damages, attorney's fees and expenses, and front pay.

## DISCUSSION

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (quoting FED.R.CIV.P. 56(e)). The Eighth Circuit has "repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted). It is also clear, however, that "[t]o survive a motion for summary judgment, the nonmoving party must 'substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d

732, 733-34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)).

### A. Sexual Harassment and Discrimination

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of, among other things, the individual's sex. *See* 42 U.S.C. §§ 2000e-2(a)(1). Irwin's state-law claims are evaluated under the same standards as her Title VII claims. The Irwin's claim of a hostile work environment is evaluated under the burden-shifting analysis of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). *See Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004). The first step in the *McDonnell Douglas* analysis requires the plaintiff to establish a prima facie case of discrimination. *See id.* If plaintiff establishes a prima facie case, the burden then shifts to the employer to advance a legitimate, nondiscriminatory reason for the employment action. *See id.* If the employer articulates such a reason, the plaintiff must then demonstrate that the employer's stated reason is pretextual and that the real reason for the employer's adverse employment action was unlawful sex discrimination. *See id.*; *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1157 (8th Cir. 1999). The plaintiff carries at all times the burden of proving that her termination was motivated by intentional discrimination. *See Fast v. Southern Union Co., Inc.*, 149 F.3d 885, 890 (8th Cir. 1998); *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1021 (8th Cir. 1998).

"To establish a prima facie case on a hostile work environment sexual harassment claim, the Plaintiff must prove: (1) that she was a member of a protected group, (2) the occurrence of unwelcome harassment, (3) a causal nexus between the harassment and her membership in the protected group, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Erenberg*, 357 F.3d at 792.

Irwin has satisfied elements one through three, but the Court finds she has not met elements four and five. To satisfy the fourth element the conduct "'must be extreme and not merely rude or unpleasant' before it can be said to have, in an objective sense, affected the terms and conditions of

employment." *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004) (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). To survive ThermoBond's summary judgment motion on her hostile work environment claim, Irwin must "present evidence from which a reasonable jury could find that [the alleged harassing employee's] conduct towards her was more than merely offense, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment." *Id.* In making the determination about whether a work environment is both objectively and subjectively offense, such that a reasonable person would consider it to be hostile or abusive, the court must consider "'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Erenberg*, 357 F.3d at 792 (quoting *Breeding*, 164 F.3d at 1156).

There were seven incidents between Buchholz and Irwin that occurred over a five to eight-week period of time. The comments were of a sexual nature, but Buchholz's comments would not cause a reasonable person to believe his words were intended to abuse, humiliate or degrade Irwin or create a hostile or abusive environment. Buchholz did not make physical contact with Irwin or make any sexual gestures. Instead, Buchholz was crudely and boorishly trying to establish a relationship with Irwin. Moreover, Irwin did not testify to any unreasonable interference with her work performance caused by Buchholz. Rather, she felt she was getting better at building receptacles. She does not allege that Buchholz's conduct caused her to be unable to perform the tasks Pottebaum hoped Irwin could do when he created the job for Irwin.

Although the Court finds Buchholz's conduct inappropriate, rude and unprofessional, the conduct in this case is not as severe or pervasive as the conduct the Eighth Circuit has found to be sufficient to establish a prima facie case of sexual harassment. *See, e.g., Eich v. Bd. of Regents for Cent. Mo. St. Univ.*, 350 F.3d 752, 755-56 (8th Cir. 2003) (holding plaintiff established the fourth element when plaintiff was frequently touched in many sexually suggestive ways and was subject to simulated sex acts); *Beard v. Flying J., Inc.*, 266 F.3d 792, 797 (8th Cir. 2001) (affirming a

judgment in favor of plaintiff based on an employee brushing, rubbing and flicking plaintiff's breasts and pointing to his crotch); and *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838 (8th Cir. 1998) (finding plaintiff was subjected to another employee constantly saying sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures). Accordingly, she has not established the fourth element of a prima facie case.

Irwin has also failed to establish the fifth element of a prima facie case. Although Irwin informed Anglin that Buchholz had made a "gross" comment about her wearing shorts the first time she spoke to Anglin about Buchholz, she neither informed Anglin she felt she was being harassed nor asked Anglin to address the situation. Rather, she told him she could handle the situation. The first time Irwin attempted to inform her superiors that she felt Buchholz was harassing her was when she talked to Ludwig. Ludwig informed Anglin of Irwin's allegations when he returned to the office. Anglin spoke to Irwin about these allegations and he told her he would speak with Pottebaum. Before Anglin spoke with Pottebaum, who was out of the office at the time Anglin first spoke with Irwin, Irwin again complained to Ludwig. Ludwig informed Pottebaum of these allegations when he returned to the office a day or two later and Pottebaum immediately began an investigation by speaking with Anglin, Irwin's direct supervisor, and several people that worked closely with Irwin and Buchholz.

Pottebaum spoke with Hawkins, one of the employees Irwin was close to, and he denied witnessing any harassing behavior by Buchholz, but told Pottebaum that Irwin had talked to him about Buchholz's comments. No one else that Pottebaum talked to had witnessed any harassing behavior by Buchholz. Pottebaum concluded from this investigation that Irwin's allegations were unfounded, but he nevertheless moved Buchholz to a new building that was approximately two miles away from the shop in which Irwin worked and asked that Buchholz limit his visits to the shop by having his partner, Sullivan, retrieve parts as much as possible.

Irwin testimony is contradictory on the timing of Buchholz's last comment to her that she construed as sexual in nature. She testified, however, that for the last four to six weeks of her

11

employment with ThermoBond, Buchholz did not make any bad or perverted comments. Irwin does not contest Pottebaum's testimony that after she complained to him and Buchholz was moved to the new building, she denied any further harassment when asked by Pottebaum. Based upon the evidence in the record, the Court concludes ThermoBond took prompt and effective remedial action when her superiors were made aware of Irwin's allegations of harassment by Buchholz.

Even if Irwin had established a prima facie case, the Court finds that ThermoBond advanced a legitimate, nondiscriminatory reason for Irwin's termination. Pottebaum testified Irwin was not meeting the expectations he had for the new position created for Irwin. He hoped Irwin could learn how to make entire units that the electricians could take to the buildings in one piece and then install on the walls. Irwin does not dispute Pottebaum's testimony regarding the expectations he had for the new position created for her. Irwin was only able to learn how to make receptacles and her work product on the receptacles was not acceptable to some of the electricians. Irwin does not contend she was making entire units for the electricians to install in one piece and does not dispute that some of the electricians were not satisfied with the receptacles she made.

The burden then shifts to Irwin to establish that ThermoBond's stated reason for her termination is pretextual. There is no evidence in the record to show that Pottebaum's stated reason is pretextual. The position created for Irwin was expressly stated to be experimental or temporary for a 90-day period of time. Pottebaum had clear expectations for this position and Irwin does not dispute those expectations or the fact that she could not meet them. After Irwin was terminated, no one was hired to perform the job Irwin was hired to do. She also has not shown that any similarly situated male employee was treated any differently than she was treated.

To the extent Irwin is claiming ThermoBond failed to give females equal opportunity for employment, she would have to establish the following to show a prima facie case of gender discrimination: (1) that she is within the protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (the opposite gender in the Title VII sex discrimination context) were not treated the same. *See Breeding,*

164 F.3d at 1157. The fourth element of the prima facie case in a Title VII context has also been articulated as requiring that there be "some evidence that would allow the inference of improper motivation." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995). The Supreme Court recognized that elements of a plaintiff's prima facie case will necessarily vary based upon the differing factual situations in Title VII cases. *See McDonnell*, 411 U.S. at 802, n.13; *Hindman*, 145 F.3d at 990-91 (recognizing that the proof necessary to establish a prima facie case in discrimination cases is "not inflexible" and "varies somewhat with the specific facts of each case."). The Eighth Circuit has noted that "[a]n inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996).

Irwin cannot establish the second and fourth elements of her prima facie case. As explained above, Irwin cannot establish that she was qualified to perform the job created for her by ThermoBond. Moreover, Irwin has presented no evidence that males were not treated the same as she was treated. Her job was experimental and Irwin knew when she accepted the position that it was a temporary position, for which she would undergo training, and if she "caught on", there was a "possibility for a full-time position." (Irwin Depo. at 35.) There is no inference of discrimination as a result of a replacement or treatment of a similarly situated male employee because ThermoBond has not hired anyone to do the job that Irwin was hired to do and no one else was doing the same job that Irwin was doing at ThermoBond. Rather, the electricians were building their own parts before Irwin started working for ThermoBond and now that she is gone, the electricians have resumed building all of their own receptacles. Accordingly, Irwin has not established a prima facie case of gender discrimination.

**B.     Retaliation - Title VII**

Title VII provides that it shall be an unlawful employment practice for any employer to retaliate against an employee or an applicant for employment "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, Irwin must show that she engaged in a protected activity, that ThermoBond took adverse action against her, and that there is a connection between the two. *See Scott v. County of Ramsey*, 180 F.3d 913, 917 (8th Cir. 1999). If Irwin makes this showing, a presumption of retaliation arises, and the burden of production shifts to ThermoBond to advance a legitimate reason for her termination. *See id.* If a legitimate reason is advanced, the presumption of retaliation disappears and "'the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997) (en banc)). "In some situations, this can be shown indirectly by establishing that the defendant's proffered reason is merely a pretext for retaliation." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).

Irwin engaged in protected activity by reporting to her superiors that she felt Buchholz was sexually harassing her. She did not testify that she informed her superiors she felt she was being discriminated against on the basis of her sex. ThermoBond did terminate her employment after she reported Buchholz's conduct. There is no genuine issue of material fact, however, that Irwin's termination was connected to her reporting Buchholz's alleged comments and actions to Anglin or Pottebaum. Irwin does not dispute that Pottebaum promptly investigated her allegations. She does not dispute that Pottebaum informed her he would not tolerate any harassing behavior by one employee against another. Although Pottebaum did not conclude the allegations were true, he, nevertheless, took steps to separate Buchholz from Irwin as much as possible. This action was effective in stopping any alleged sexual harassment by Buchholz. Irwin does not dispute that Pottebaum followed up with her during the last four weeks of her employment to determine whether Irwin felt like there was any continuing harassment. Irwin denied to Pottebaum during those follow up contacts that there was any continuing harassment by Buchholz.

Even if Plaintiff were able to establish a prima facie case of retaliation, ThermoBond advanced a legitimate reason for her termination, as explained above. Irwin has not produced evidence to create a genuine issue of material fact that ThermoBond intentionally discriminated

against her. There is no evidence that ThermoBond's reason for terminating Irwin, i.e. that she could not perform the expectations of the job created for her, is merely a pretext for retaliating against her for complaining that she believed Buchholz was sexually harassing her.

The allegation that Irwin was terminated because Buchholz was going to be returning to the building she was working in is not supported by the evidence in the record. Buchholz continued working at the new building Pottebaum transferred him to for approximately one year after Irwin was terminated. Moreover, the electricians only retrieved parts from the shop where Irwin worked and never worked in that building on a full-time basis. (Buchholz Depo. at 46-47.)

## CONCLUSION

The Court finds that Plaintiff has not established a prima facie case on any of her claims and ThermoBond is entitled to summary judgment on all of her claims. Even if she had established a prima facie case, ThermoBond would still be entitled to summary judgment because it advanced a legitimate, nondiscriminatory reason for her termination and Irwin has not raised a triable issue that the reason given was a pretext for discrimination or retaliation. Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment, Doc. 29, is granted.

Dated this 25th day of April, 2007.

BY THE COURT:

*[signature]*
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: *[signature]*
DEPUTY

15